DONALD BOLTON,                    )
                                 )
        Plaintiff,               )          No. 14 C 03580
                                 )
        v.                       )
                                 )          Judge Edmond E. Chang
ROBINZINA BRYANT, et al.,        )
                                 )
        Defendants.              )

## MEMORANDUM OPINION AND ORDER

Plaintiff Donald Bolton applied for a license to carry a concealed weapon under the recently enacted Firearm Concealed Carry Act. 430 ILCS 66/1, *et seq*. His application was denied because of an objection by law enforcement. *See* R. 1, Compl. ¶¶ 13, 15. Bolton filed this suit under 42 U.S.C. § 1983 against the members of the Illinois Concealed Carry Licensing Board and agents of the Illinois Department of State Police for alleged violations of his procedural due process and Second Amendment rights.[1] Bolton now moves for a preliminary injunction, and Defendants move to dismiss Bolton's suit under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). *See* R. 35, Pl.'s Mot. Prelim. Inj.; R. 41, Defs.' Mot. Dismiss. For the reasons stated below, Bolton's motion is denied, and Defendants' motion is granted in part and denied in part.

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 1331. Citations to the docket are indicated by "R." followed by the docket entry.

# I. Background

In 2012, the Seventh Circuit applied the Second Amendment (via incorporation through the Fourteenth Amendment) to invalidate an Illinois law that prohibited carrying a ready-to-use gun outside the home, a fixed place of business, or the property of someone who gave permission to the person carrying the ready-to-use gun. *Moore v. Madigan*, 702 F.3d 933, 934, 942 (7th Cir. 2012). The Seventh Circuit stayed its judgment for 180 days "to allow the Illinois legislature to craft a new gun law that will impose reasonable limitations, consistent with the public safety and the Second Amendment as interpreted in this opinion, on the carrying of guns in public." *Id.* at 942. In response, the Illinois legislature passed the Firearm Concealed Carry Act, which went into effect on July 9, 2013. 430 ILCS 66/1, *et seq.* Under the Act, the Department of State Police "shall issue a license to carry a concealed firearm" to an applicant who meets certain statutory qualifications, submits requisite documentation and fees, and "does not pose a danger to himself, herself, or others, or a threat to public safety." 430 ILCS 66/10(a).

To determine if an applicant meets this last requirement under the Act, an applicant's information is entered into a database by the Department of State Police. 430 ILCS 66/10(i). Law enforcement agencies can access this database and may submit any objections to an applicant "based upon a reasonable suspicion that the applicant is a danger to himself or herself or others, or a threat to public safety." 430 ILCS 66/15(a). If an objection is made, the Concealed Carry Licensing Board—a body created by the Act—considers the objection. 430 ILCS 66/20(a). When

considering an objection, the Board "shall review the materials received with the objection from the law enforcement agency," and the Board "*may* request additional information from the law enforcement agency, Department [of State Police], or the applicant." 430 ILCS 66/20(e) (emphasis added). The Board may only consider the information submitted by the law enforcement agency, the Department of State Police, or the applicant. *Id.* After reviewing the objection, the seven-member Board determines whether the applicant is eligible for a license by a majority vote. *Id.*; 430 ILCS 66/20(a). If an application is denied, the applicant may seek judicial review under the Illinois Administrative Review Act. 430 ILCS 66/87; *see also* 735 ILCS 5/3-101 *et seq.*

Bolton applied for a concealed carry license in January 2014. Compl. ¶ 11. The Chicago Police Department objected to Bolton's application. *Id.* ¶13. The objection alleged that Bolton had been arrested for impersonating a peace officer and unlawful use of a weapon. R. 57, Defs.' Resp. at 3; R. 57, Defs.' Exh. A, Law Enforcement Objection at AGO 000038. The basis for the objection (the arrests) has been revealed now, but at the time that the Board acted on Bolton's application, the Board did not inform Bolton of that basis. The Board neither notified Bolton of the objection nor requested additional evidence from him, and concluded that Bolton's application should be denied based on a failure to meet the public-safety requirement of 430 ILCS 66/10(a). Compl. ¶¶ 14-15. Bolton did not appeal the denial under the Illinois Administrative Review Act. Instead, he filed this lawsuit under 42 U.S.C. § 1983, alleging that the license requirement is an improper prior

restraint on his Second Amendment rights, *id.* ¶¶ 25-31, and that the licensing procedures denied him due process of law. *Id.* ¶¶ 16-24.

After filing the lawsuit, Bolton eventually moved for a preliminary injunction to prevent Defendants from interfering with his right to carry a concealed handgun outside his home, acting against him for carrying a concealed handgun without a license, or preventing him from teaching firearms safety classes. Pl.'s Mot. Prelim. Inj. at 1-2. Shortly thereafter, Defendants moved to dismiss both counts for failure to state a claim under Rule 12(b)(6) and moved to dismiss the due process count on abstention grounds under Rule 12(b)(1). Defs.' Mot. Dismiss at 5-11.

## II. Legal Standards

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of*

*Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

Federal Rule of Civil Procedure 12(b)(1) provides the procedural vehicle by which the defendant may move a federal court to dismiss a claim or suit on the ground that the court lacks jurisdiction.[2] See Fed.R.Civ.P. 12(b)(1); *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). When evaluating a motion to dismiss under Rule 12(b)(1), the court must accept all well-pled allegations as true and draw reasonable inferences in the plaintiff's favor. *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). The court may "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue." *Id.* (quoting *Capitol Leasing Co. v. Fed. Deposit Ins. Corp.*, 999 F.2d 188, 191 (7th Cir. 1993) (per curiam)).

---

[2]A motion to dismiss on abstention grounds does not fit neatly into Rule 12(b)(1) or Rule 12(b)(6). Courts in this district have recognized this difficulty in categorization, *see, e.g., Carter v. Doyle*, 95 F. Supp. 2d 851, 855 n.8 (N.D. Ill. 2000), and the Seventh Circuit has not commented on which subsection is more appropriate. *See Majors v. Engelbrecht*, 149 F.3d 709, 711 (7th Cir. 1998) (noting without comment that the district court converted a 12(b)(1) motion to dismiss on abstention grounds into a 12(b)(6) motion to dismiss). Because the motion to dismiss on abstention grounds asks the Court to decline to exercise jurisdiction, it fits more comfortably under Rule 12(b)(1), and it will be considered under that standard. Bolton does not object to this characterization of the motion. *See* R. 58, Pl.'s Resp. at 1 n.1.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). To prevail on a motion for a preliminary injunction, the moving party must show (1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) an irreparable harm will result if the injunction is not granted. *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007). If the moving party meets these requirements, then the court balances the nature and degree of the potential harm to each party and the public interest. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

### III. Analysis

Bolton alleges that the process by which his application for a concealed-carry license was denied violated his right to procedural due process and was an improper prior restraint on his Second Amendment rights. Compl. ¶¶ 16-31. He has asked for a preliminary injunction to protect these rights, and Defendants have moved to dismiss. As explained below, because the outcome of the motion to dismiss controls the resolution of the motion for a preliminary injunction, the Court will address Defendants' motion first.

### A. Due Process Claim

### 1. Failure to State a Claim

Defendants argue that Bolton's due process claim should be dismissed. To state a claim for violation of procedural due process, Bolton must show, "(1)

deprivation of a protected interest, and (2) insufficient procedural protections surrounding that deprivation." *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008) (citing *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir. 1996)). In evaluating whether the procedural protections are sufficient, the Court must balance:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "Not every deprivation of property requires the full arsenal of available procedural safeguards." *Clancy v. Office of Foreign Assets Control*, 559 F.3d 595, 600 (7th Cir. 2009). The question is not whether additional procedures would be helpful, but whether "the existing procedures are constitutionally defective because they present an unreasonable risk of an erroneous deprivation of the private interest, in light of the particular situation." *Id.*

In their motion to dismiss, Defendants do not contest that Bolton has a protectable interest (and given the mandatory "shall" directive to issue the license unless an exception applies, it is likely that there is indeed a protectable interest). Instead, Defendants argue that Bolton cannot show that Act had insufficient procedural protections. Defendants claim that "the Act lays out the proper recourse for an aggrieved party who believes he or she has been improperly denied a concealed carry license": an administrative review action in state court. Defs.' Mot.

Dismiss at 5. Because Bolton would have been able to raise his constitutional challenge in the state-court review of the administrative proceeding, Defendants contend that Act provided sufficient procedural protections. *Id.* at 5-6.

To support the argument that postdeprivation review is sufficient to meet due process requirements, Defendants argue that the denial of the license was a "random and unauthorized" act. That characterization is important because when a state official commits acts that are "'random and unauthorized[,]' the state is *only* responsible for providing postdeprivation remedies." *Veterans Legal Defense Fund v. Schwartz*, 330 F.3d 937, 940 (7th Cir. 2003) (emphasis added); *see also Parratt v. Taylor*, 451 U.S. 527, 540-41 (1981); *Hudson v. Palmer*, 468 U.S. 517, 533-34 (1984); *Zinermon v. Burch*, 494 U.S. 113, 129-130 (1990). This rule "is not an exception to the *Mathews* balancing test, but rather an application of that test to the unusual case in which one of the variables in the *Mathews* equation—the value of predeprivation safeguards—is negligible in preventing the kind of deprivation at issue." *Zinermon*, 494 U.S. at 129. The point is that the state cannot feasibly provide for predeprivation process when the deprivation arises from random and unauthorized conduct; how would the state know *when* to provide the process if the conduct is random and unauthorized? By contrast, when state action is taken pursuant to established state procedures—so it is at least possible to provide predeprivation process, because the deprivation will occur at a predictable moment—postdeprivation remedies are not *automatically* sufficient to satisfy due

process requirements. *Leavell v. Illinois Dept. of Natural Res.*, 600 F.3d 798, 805 (7th Cir. 2010).

Defendants first argue that the deprivation that Bolton suffered was random and unauthorized because the Board had discretion to hear additional evidence from Bolton after receiving the law enforcement objection. R. 60, Defs.' Sur-Reply at 2 (citing 430 ILCS 66/20(e)). In exercising its discretion, the Board *could* give an applicant the opportunity to be heard and to offer evidence in some instances. Defendants argue, therefore, that it cannot be the Board's established policy to deny applicants a predeprivation right to be heard. *Id.* They further argue that the Board's actions cannot be characterized as "predictable and authorized," because each license application is unique and the Board's response to each will therefore also be unique and unpredictable. *Id.* at 2-3. Finally, Defendants claim that a violation of due process cannot be authorized because the statute would never authorize the Board to violate due process. *Id.* at 3.

Defendants' arguments miss the mark. When a state official acts within the bounds of discretion given to him by law, his acts are not random and unauthorized. *Zinermon*, 494 U.S. at 135 ("It may be permissible constitutionally for a State to have a statutory scheme . . . which gives state officials broad power and little guidance . . . . But when those officials fail to provide constitutionally required procedural safeguards . . . the state officials cannot then escape liability by invoking *Parratt* and *Hudson*."). In denying Bolton's application for a license, the Board did not act outside the bounds of its statutory authority. *See* 430 ILCS 66/20(e) ("[T]he

Board *may* request additional information from the law enforcement agency, Department [of State Police], or the applicant.") (emphasis added). The statute gives the Board discretion to decide whether it will give an applicant notice of a law enforcement objection or an opportunity to be heard. Any erroneous deprivation will occur at this "specific, predictable" point in the process. *Zinermon*, 494 U.S. at 136. This differs from a truly random and unauthorized deprivation, when the state cannot identify when or even how a deprivation will occur because the state official is acting outside the bounds of the official's authority. *See, e.g., Parratt*, 451 U.S. at 530, 541 (prison guard negligently destroying a prisoner's property); *Hudson*, 468 U.S. at 519-20, 533 (prison guards harassing prisoners); *Veterans Legal Defense*, 330 F.3d at 941 (state official violating a statutory hiring preference for veterans); *Easter House v. Felder*, 910 F.2d 1387, 1401-02 (7th Cir. 1990) (state officials conspiring to deprive an adoption agency of its operating license). The Board's actions were not "patently inconsistent with Illinois law" or "an outright departure from the authority" that the Board was given by statute. *See Easter House*, 910 F.2d at 1401. The Board members acted in a foreseeable manner based on their statutory directives.

Moreover, Defendants' argument that the alleged deprivation could not be authorized because the statute would not authorize a violation of due process is circular. No state *intends* to violate due process, but some established procedures might fall short of the constitutional minimum. If any state procedure that does not satisfy the requirements of due process is random and unauthorized because the

state could not possibly authorize a denial of due process, there could *never* be a due process violation due to established state procedure. Every denial of process would be random and unauthorized and could be automatically cured by postdeprivation remedies alone. This is clearly at odds with the very idea that some procedure (or lack of procedure) can violate due process because it was not provide before the deprivation occurred. The alleged deprivation that Bolton suffered was therefore not random and unauthorized, and the availability of postdeprivation state-court review is not automatically sufficient to overcome Bolton's due process claim.

Even though the conduct of the Board and Department of State Police was not random and unauthorized, the postdeprivation procedures provided through the Illinois Administrative Review Act are still relevant to the due-process analysis. When evaluating a procedural due process claim, "the constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Zinermon*, 494 U.S. at 126. It is necessary, therefore, to "examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." *Id.* Although due process typically "requires that a person not be deprived of [his protected interest] without notice and an opportunity for a hearing," *Siebert v. Severino*, 256 F.3d 648, 659 (7th Cir. 2001) (citation omitted), due process is a "flexible" concept. *Mathews*, 424 U.S. at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). "The precise timing and form of the procedures that the government must afford an

individual hinge upon the particularities of the situation." *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 617-18 (7th Cir. 2002).

Courts have recognized several circumstances in which postdeprivation remedies, either alone or coupled with some limited predeprivation protections, can satisfy due process. Although "the Constitution [usually] requires some kind of hearing *before* the State deprives a person of liberty or property," postdeprivation remedies may be sufficient when, for example, the state must act quickly, the length or severity of the deprivation does not pose a risk of serious loss, or when the combination of procedures are reliable enough to minimize risk of erroneous deprivation. *Zinermon*, 494 U.S. at 127-28; *see also United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993) ("We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.") (internal quotation marks and citations omitted). The Court must ask if "predeprivation process is a reasonable requirement to impose. That depends on the balance between the benefits and the costs of such process." *Siebert*, 256 F.3d at 659; *see also Ellis v. Sheahan*, 412 F.3d 754, 757-58 (7th Cir. 2005); *Porter v. DiBlasio*, 93 F.3d 301, 305-06 (7th Cir. 1996). So the Court must apply the *Mathews* balancing test to determine whether the particular combination of procedural safeguards available to Bolton satisfied the requirements of due process.

Accepting the allegations of the complaint as true, Bolton has plausibly alleged that the process provided by the Board and Department of State Police was insufficient under the *Mathews* framework. *Mathews* requires courts to balance (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. Bolton's private interest here is significant. A denial of a concealed-carry license will prevent Bolton from exercising his constitutional right to carry a weapon outside the home for self-defense. *See Moore*, 702 F.3d at 942. Bolton alleges that the predeprivation process that he received was *ex parte* (meaning law enforcement was able to submit evidence and argument to the Board without him knowing about it or given a chance to respond to it), and that he was not afforded notice or given any chance to present or rebut the objection. *See* Compl. ¶¶ 14-15. This lack of predeprivation process creates a high risk of erroneous deprivation, because an applicant has no opportunity to rebut incorrect objections or the inferences drawn from those objections before his application is denied. *See James Daniel Good*, 510 U.S. at 55; *Doyle*, 305 F.3d at 618-19. Allowing an applicant to participate through notice and an opportunity to be heard when there is a law enforcement objection would meaningfully reduce the chance of an erroneous deprivation. These procedures would not likely be burdensome on the

Board. Unlike many cases in which courts have found limited predeprivation procedures coupled with more comprehensive postdeprivation procedures satisfied due process requirements, the Board was not required to act quickly in denying the concealed carry license. *See, e.g., Ingraham v. Wright*, 430 U.S. 651, 682 (1977); *Doyle*, 305 F.3d at 619. Nor are there any other apparent governmental interests that would make notice of a law enforcement objection and a predeprivation hearing unduly burdensome. In fact, Illinois now provides procedures of this nature through newly enacted emergency regulations. *See* R. 41-1, Defs.' Exh. A, Emergency Regulations. Additional discovery might be needed to determine the precise burdens and interests at issue here, but, at this stage, Bolton has plausibly alleged a violation of his right to due process. Defendants' motion to dismiss the due process count for failure to state a claim is denied.

## 2. *Younger* Abstention

Defendants also move to dismiss Bolton's due process claim based on the abstention principles of *Younger v. Harris*, 401 U.S. 37 (1971). *Younger* abstention "generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *FreeEats.com, Inc. v. Indiana*, 502 F.3d 590, 595 (7th Cir. 2007) (citing *Younger*, 401 U.S. at 43-44). The doctrine originally applied only to criminal prosecutions, but has since expanded to apply to certain state judicial and administrative proceedings that implicate important state interests. *Forty One News, Inc. v. Cnty. of Lake*, 491 F.3d 662, 665 (7th Cir. 2007).

Defendants argue that *Younger* abstention should apply to this case even though there is no ongoing state proceeding. Defs.' Mot. Dismiss at 7. *Younger* abstention is only appropriate, however, "when there is an action in state court against the federal plaintiff and the state is seeking to enforce the contested law in that proceeding." *Forty One News*, 491 F.3d at 665; *see also Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992) ("[W]e have never applied the notions of comity so critical to *Younger*'s 'Our Federalism' when no state proceeding was pending nor any assertion of important state interests made . . . . Absent any *pending* proceeding in state tribunals, therefore, application by the lower courts of *Younger* abstention was clearly erroneous.") (emphasis in original); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 606 ("Younger turned on considerations of comity and federalism peculiar to the fact that state proceedings were pending."). "The mere fact that a case *could* be heard in state court is insufficient to justify *Younger* abstention." *Village of DePue, Ill. v. Exxon Mobil Corp.*, 537 F.3d 775, 783 (7th Cir. 2008). Here, there is no pending state-court proceeding, as Bolton did not appeal the denial of the permit.

Defendants rely on *Nelson v. Murphy*, 44 F.3d 497 (7th Cir. 1995), to support their argument that "*Younger* abstention applies notwithstanding the fact that there is no on-going state court litigation." Defs.' Mot. Dismiss at 7. In *Nelson*, the plaintiffs were challenging the conditions of their civil commitment through a § 1983 suit. 44 F.3d at 499. The district court "thought *Younger* irrelevant because plaintiffs do not seek to enjoin any state court proceeding." *Id.* at 501 (internal

quotation marks omitted). Noting that "[t]he principle of *Younger* is that a party to a state proceeding affecting important governmental interests must resolve the dispute in the state's preferred tribunal," the Seventh Circuit nevertheless held that *Younger* applied. *Id.* at 501-02. In Illinois, state criminal courts closely supervise civil commitment; the staff of the state facility where the plaintiffs were confined was required to submit a treatment plan to the court for approval every 60 days, which the plaintiffs could have opposed on constitutional grounds in that forum. *Id.* The plaintiffs did not present their constitutional objections to their treatment plans in the state criminal court, but instead filed a § 1983 suit in federal court. *Id.* After the filing of the federal suit, plaintiffs were released. *Id.* at 502. They were not, therefore, parties to any active state-court proceeding. *Id.* Despite the lack of an ongoing state proceeding, the Seventh Circuit held that the "parties may not avoid *Younger* by withholding defenses from the state proceeding and commencing the federal suit as soon as the state case ends." *Id.* (citing *Huffman*, 420 U.S. at 607-11).

That description of *Nelson* makes clear that it does not help Defendants in this case. Unlike Bolton, the plaintiffs in *Nelson* had already participated in state proceedings in which they could have raised their constitutional claims. The Seventh Circuit's concern was that plaintiffs would fail to raise issues in the state-court proceedings "because they were dissatisfied with the relief that state courts had afforded to other inmates," or, the Seventh Circuit suspected, because of the "shakiness of plaintiffs' arguments on the merits." *Id.* at 501-02. Such "[f]ederal post-trial intervention . . . deprives the States of a function which quite legitimately

is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction." *Id.* (quoting *Huffman*, 420 U.S. at 609). *Nelson* ultimately concludes that "an inmate *already participating* in state litigation must make his stand there rather than attempt the equivalent of federal-defense removal by filing an independent § 1983 suit." *Id.* at 502 (emphasis added). Bolton has not attempted to side-step state proceedings by failing to raise defenses in the state-court litigation. He did not participate in state-court litigation at all, and he did not have the opportunity to raise his constitutional claims in the administrative proceeding before the Board. In fact, he did not have the opportunity to raise *any* claims in the administrative proceeding before the Board. The reasoning of *Nelson* is therefore inapplicable to this case, and *Younger* abstention is not warranted.

Even if Defendants could avoid the pending-proceeding requirement under *Nelson*, *Younger* abstention still would not apply. A court may only abstain under *Younger* from (1) state criminal prosecutions, (2) civil enforcement proceedings, and (3) civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions. *Sprint Commc'ns, Inc. v. Jacobs*, —— U.S. ——, 134 S.Ct. 584, 588 (2013) (citing *New Orleans Public Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 367-68 (1989)). Defendants argue that the denial of Bolton's application by the Board was a civil enforcement proceeding. *See* Defs.' Mot. Dismiss at 8. They reason that the objection to Bolton's application

was an enforcement proceeding initiated by a state actor and was "a complaint" against Bolton to restrict his right to carry a concealed weapon. *Id.*

The Supreme Court's decisions "applying *Younger* to instances of civil enforcement have generally concerned state proceedings 'akin to a criminal prosecution' in 'important respects.'" *Sprint*, 134 S.Ct. at 592 (quoting *Huffman*, 420 U.S. at 604). These actions are "characteristically initiated to sanction the federal plaintiff . . . for some wrongful act." *Id.* (noting also that "a state actor is routinely a party to the state proceeding and often initiates the action"). They are often "judicial in nature" and "offer an adequate opportunity to review the federal claim." *Mulholland v. Marion Cnty. Election Bd.*, 746 F.3d 811, 816 (7th Cir. 2014) (internal quotation marks and citations omitted). In *Sprint*, the Court held that Sprint's state-court lawsuit to overturn the Iowa Utilities Board's administrative decision did not fall into this category. *Sprint*, 134 S.Ct. at 592. It was not "akin to a criminal prosecution," it was not "initiated by the State in its sovereign capacity," "[n]o state authority conducted an investigation into Sprint's activities," and "no state actor lodged a formal complaint against Sprint." *Id.* (internal quotation marks and citations omitted). *See also Mulholland*, 746 F.3d at 816 (noting that, after *Sprint*, a civil enforcement proceeding must be "quasi-criminal" to warrant *Younger* abstention).

Similarly, Bolton's application for a concealed-carry license does not qualify as a civil enforcement proceeding. Defendants' arguments that the concealed-carry application process is quasi-criminal or initiated to somehow sanction Bolton are

unconvincing. *Bolton* himself initiated the proceeding when he applied for a concealed-carry license. If Bolton had not filed the application, the Chicago Police Department would have had no reason to file any "complaint" against him. Furthermore, the denial of the application cannot properly be construed as a "sanction" against Bolton. The Board does not deny licenses based on law enforcement objections to punish applicants for the conduct described in the objection. The Board denies licenses based on law enforcement objections when it determines that the applicant is a danger to himself or the community. 430 ILCS 66/10(a), 20(e). The administrative proceeding was therefore not initiated by the State to sanction Bolton for his wrongful acts. Nor does the mere inclusion of criminal records into the administrative review process make this "akin to a criminal prosecution." *Younger* abstention is only warranted in "exceptional situations." *Mulholland*, 746 F.3d at 816 (internal quotation marks and citations omitted). To apply *Younger* abstention to an administrative proceeding like the denial of a license would "extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest." *Sprint*, 134 S.Ct. at 593. *Younger* abstention is not warranted in this case, and Defendants' motion to dismiss as to Bolton's due process claim is denied.

### B. Prior Restraint Claim

Bolton alleges that the "unfettered discretion" of the licensing authority is an unconstitutional prior restraint on his Second Amendment rights. Compl. ¶¶ 25-31. He argues that Illinois may not "specifically license the right to keep and bear arms

outside of the home," or that the licensing regime must be "narrowly tailored to serve a compelling government interest." *Id.* ¶ 26. Although the prior restraint doctrine is typically confined to the First Amendment, Bolton argues that the similarities between the rights guaranteed by the First and Second Amendments warrant extension of the prior restraint doctrine to his case. R. 36, Pl.'s Br. at 3-8. Defendants move to dismiss the prior restraint count for failure to state a claim, arguing that the prior-restraint analysis must be confined to the First Amendment, and that, even if the prior-restraint framework did apply, the licensing regime is constitutional. Defs.' Resp. at 9-11.

Under the First Amendment, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S 147, 150-51 (1969). A law imposing a prior restraint "bear[s] a heavy presumption against its constitutional validity." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) (internal quotation marks and citations omitted). The rationale behind this doctrine is "the idea that prior restraints are particularly harmful to expressive freedoms," *Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1123 (7th Cir. 2001), and concern about the "chilling effect" of censorship. *Freedman v. Maryland*, 380 U.S. 51, 60 (1965); *see also Thomas v. Chicago Park Dist.*, 227 F.3d 921, 923 (7th Cir. 2000) (stating that a prior restraint must "be free of any element of vagueness or uncertainty that might enable the regulation to be enforced in such a way as to

deter or impede the exercise of this most celebrated of constitutional rights”); *Stokes v. City of Mason*, 930 F.2d 1163, 1169 (7th Cir. 1991) (“The Court’s fear was the potential for censorship.”). In fact, the Supreme Court has held that “it is the chief purpose of the [First Amendment] guaranty to prevent previous restraints upon publication.” *Near v. Minnesota*, 283 U.S. 697, 713 (1931).

Bolton concedes that the defense is correct in arguing that there is no binding authority applying the prior restraint doctrine to the Second Amendment. *See* Pl.’s Br. at 3; Defs.’ Mot. Dismiss at 10. In asserting that the doctrine should be extended to the Second Amendment, Bolton argues that courts have often analogized to the First Amendment in evaluating challenges on Second Amendment grounds. It “naturally follows,” therefore, that First Amendment prior-restraint analysis is appropriate in this context as well. *See* Pl.’s Br. at 3-4 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, —— U.S. ——, 130 S.Ct. 3020 (2010); *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)); Pl.’s Resp. at 9.

Bolton is halfway correct, but ultimately wrong. It is true that *District of Columbia v. Heller*, the Supreme Court’s seminal Second Amendment decision, often draws parallels between the First and Second Amendments. *See* 554 U.S. at 579 (comparing the text of the Second Amendment to the First, Fourth, and Ninth Amendments and concluding that the phrase “right of the people” creates an individual right); *id.* at 582 (holding that, like the First and Fourth amendments, the Second Amendment can be extended to modern technology); *id.* at 591 (analogizing to the First Amendment to support the principle that “multiple

(related) guarantees" may be grouped under a "singular 'right'"); *id.* at 592 ("[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right."); *id.* at 595 (noting that, like the rights under the First Amendment, the rights guaranteed by the Second Amendment are not unlimited); *id.* at 606 (reviewing Blackstone's Commentaries, which grouped the rights guaranteed by the Second Amendment with some of the individual rights guaranteed by the First Amendment); *id.* at 635 (stating that the Second Amendment is not subject to an interest balancing approach, but like the First Amendment "is the very *product* of an interest-balancing by the people"). In the follow-on case of *McDonald v. City of Chicago*, the Supreme Court also made several analogies to First Amendment law in incorporating the Second Amendment's protections to the States. *See* 130 S.Ct. at 3031 (holding that, as previously unincorporated First Amendment rights could be later incorporated, Second Amendment rights could not be incorporated to the states); *id.* at 3043 (using incorporation of the First and Fourth Amendments to explain why § 1 of the Fourteenth Amendment does more than prohibit discrimination); *id.* at 3045 (analogizing to the First Amendment to refute the argument that only those substantive rights "recognized by all temperate and civilized governments" must be incorporated) (internal quotation marks omitted). In *Ezell v. City of Chicago*, the Seventh Circuit also drew a parallel between the First and Second Amendments in deciding which standard of review to apply to a ban on gun ranges in the City of Chicago. 651 F.3d at 706. Rejecting an analogy to the Supreme Court's abortion jurisprudence, the Court concluded that "[b]oth *Heller*

and *McDonald* suggest that First Amendment analogues are more appropriate." *Id.* at 706 (citations omitted). The Court noted that "on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context." (citing *United States v. Skoien*, 614 F.3d 638, 641 (Sykes, J., dissenting); *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2010)) . The cases cited by the Seventh Circuit to support this analogy also used the First Amendment to develop the appropriate level of scrutiny for reviewing Second Amendment violations. *See Skoien*, 614 F.3d at 641 (Sykes, J., dissenting) ("Categorical limits on the possession of firearms would not be a constitutional anomaly. Think of the First Amendment, which has long had categorical limits: obscenity, defamation, incitement to crime, and others."); *Chester*, 628 F.3d at 682 ("Given *Heller*'s focus on 'core' Second Amendment conduct and the Court's frequent references to First Amendment doctrine, we agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment."); *Marzzarella*, 614 F.3d at 89 n.4 (reasoning that "the First Amendment is a natural choice" for guidance in evaluating the Second Amendment challenges and noting that "*Heller* itself repeatedly invokes the First Amendment").

Although Bolton is correct that the First Amendment has served as an important interpretive guidepost in developing Second Amendment jurisprudence, the analogy does not extend so far as to import the entire prior restraint doctrine into the Second Amendment. The prior restraint doctrine embraces concepts unique

to the First Amendment; the primary focus of the doctrine is preventing censorship and limiting the chilling effect of prior restraints on protected speech. The Supreme Court has even said that that protection against prior restraint is at the core of the First Amendment guarantee. *Near*, 283 U.S. at 713; *see also Blue Canary*, 251 F.3d at 1123 ("[W]hile the First Amendment has not been interpreted to be limited [to freedom from prior restraints], the idea that prior restraints are particularly harmful to expressive freedoms has lingered."). Analogizing to the First Amendment for the purposes of determining the level of scrutiny required to review Second Amendment challenges is not nearly enough to suggest that the prior restraint doctrine should be wholly imported into the Second Amendment. Bolton does not draw any convincing parallels between this licensing regime and a prior restraint on speech or expression that would evoke the unique concerns underlying the prior restraint doctrine. Bolton does not point to any reason why the licensing regime would in any way chill constitutional gun ownership, nor does he indicate how requiring a license to carry a concealed weapon is like censorship of expression. Moreover, the widely-accepted understanding that a state can require licenses for gun *ownership* counsels against importing prior restraint doctrine to the Second Amendment, especially in the *carry* context. *See, e.g., Heller*, 554 U.S. at 626-27, 636; *McDonald*, 130 S.Ct. at 3047; *Moore*, 702 F.3d at 942. The Court will therefore not extend the prior restraint doctrine to the Second Amendment. Bolton's Second Amendment claim is based on the prior restraint argument, so the claim is dismissed.

## C. Preliminary Injunction

Because Bolton's due process claim survives the motion to dismiss, it is necessary to evaluate his motion for a preliminary injunction. To prevail, Bolton must show (1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) an irreparable harm will result if the injunction is not granted. *Lambert*, 498 F.3d at 451. If Bolton meets these three requirements, the Court must consider if the balance of harms favors the moving party or "whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Ezell*, 651 F.3d at 694.

As discussed above, Bolton has shown that he has at least some likelihood of success on the merits of his due process claim. *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 896 (7th Cir. 2001) ("Initially, the court only needs to determine that the plaintiff has *some* likelihood of success on the merits.") (emphasis added). Bolton has also shown that he lacks an adequate remedy at law and will suffer irreparable harm. Seventh Circuit authority is clear that denial of Second Amendment rights is likely to meet the second and third requirements in the preliminary injunction inquiry, because monetary damages do not suffice to compensation for loss of Second Amendment rights. Like the First Amendment, the Second Amendment protects "intangible and unquantifiable interests." *Ezell*, 651 F.3d at 699. "Infringements of this right cannot be compensated by damages." *Id.* (noting also that "for some kinds of constitutional violations, irreparable harm is presumed"). Because denying Bolton a license to carry a concealed weapon without due process

of law would infringe upon his Second Amendment rights as described in *Moore v. Madigan*, he will suffer an irreparable harm and have no adequate remedy at law.

Nevertheless, Bolton's motion for a preliminary injunction must be denied because the balance of the harms tips strongly in favor of the public. "A preliminary injunction is an extraordinary remedy." *Winter*, 555 U.S. at 24. In considering a motion for a preliminary injunction, a court must pay particular attention to "the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Romero-Barcelo*, 456 U.S. 305 (1982)). "The aim is to minimize the costs of a wrong decision." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013) (citing *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012)). In this case, the public consequences of granting an injunction would be significant. The Board and Department of State Police use the licensing process in part to prevent a person who "pose[s] a danger to himself, herself, or others, or a threat to public safety" from carrying concealed weapons outside their own homes. *See* 430 ILCS 66/10(a). Unlike the situation in *Ezell*, in which the City's public safety concerns about gun ranges were entirely speculative, *see Ezell*, 651 F.3d at 709, the harm to the public that would result from allowing dangerous individuals to carry concealed weapons is self-evident. Even confining the inquiry to Bolton specifically, the costs of a wrong decision are substantial. Bolton has not presented evidence in his motion that refutes the law enforcement objection. Defendants and the public have a significant interest in keeping a concealed weapon out of the hands of a man who allegedly impersonated a peace officer and unlawfully used a weapon.

The harms that Bolton would suffer if the preliminary injunction were denied do not overcome the public's interest. Bolton alleges that he is entitled to a preliminary injunction because, without the right to carry a concealed weapon, he cannot defend himself or his family from physical threats. *See* Pl.'s Br. at 14-15; Pl.'s Resp. at 14. Those are important interests, but there is no record evidence of imminent or upcoming threats, and "speculative injuries do not justify th[e] extraordinary remedy" of a preliminary injunction. *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.,* 414 F.3d 700, 704 (7th Cir. 2005). Bolton has not provided any information on these potential threats that would tip the balance of harms in his favor. It is true that any erroneous deprivation of Bolton's rights under the Second Amendment is a significant and irreparable harm. *See Ezell,* 651 F.3d at 699. This harm, however, is not enough to overcome the serious harm to public safety that would arise should a preliminary injunction be erroneously granted. Bolton's motion for a preliminary injunction is denied.

## IV. Conclusion

For the reasons discussed above, Defendants' motion to dismiss is denied as to the due process claim and granted as to the prior restraint claim. Plaintiff's motion for a preliminary injunction is denied.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: October 21, 2014